AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

### for the
### Western District of Washington

FILED _____ LODGED
_____ RECEIVED

MAR 08 2018

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY _____ DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Six Facebook accounts, more particularly described in
Attachments A1 through A6

)
)
)
)
)
)

Case No.

MJ 18 -5049

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachments A1 through A6, attached hereto and incorporated by reference herein.

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, attached hereto and incorporated by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841(a)(1) and 846 | Distribution of and Conspiracy to Distribute Controlled Substances |

The application is based on these facts:

See Affidavit of DEA Special Agent Samuel T. Landis.

☑ Continued on the attached sheet.

☑ Delayed notice of _365_ days (give exact ending date if more than 30 days: _03/07/2019_ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

**Samuel T. Landis, Special Agent**
*Printed name and title*

Sworn to before me and signed in my presence.

Date: March 8, 2018

_____
*Judge's signature*

City and state:  Tacoma, Washington

**Theresa L. Fricke, United States Magistrate Judge**
*Printed name and title*

1

**AFFIDAVIT**

2

STATE OF WASHINGTON )

3 ) ss

4 COUNTY OF PIERCE )

5      I, Samuel T. Landis, Special Agent, Drug Enforcement Administration (DEA),

6 United States Department of Justice, being first duly sworn on oath, depose and state:

7

**MY BACKGROUND AND QUALIFICATIONS**

8      1.      I am an "investigative or law enforcement officer of the United States"

9 within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of

10 the United States who is empowered by law to conduct investigations of, and to make

11 arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

12      2.      I am a Special Agent with the Drug Enforcement Administration (DEA),

13 and have been so employed since March of 2016.  I am currently assigned to the Seattle

14 Field Division, Tacoma Resident Office.  Prior to my employment with the DEA, I was

15 employed as a Border Patrol Agent from November 2009 to March 2016.

16      3.      I received formal training at the DEA Basic Agent Training Academy in

17 Quantico, Virginia.  The 22-week training included comprehensive, formalized

18 instruction in, among other things:  basic narcotic investigations, drug identification and

19 detection, familiarization with United States narcotics laws, financial investigations and

20 money laundering, identification and seizure of drug-related assets, organized crime

21 investigations, physical and electronic surveillance, and undercover operations.  In

22 addition to Basic Agent Training, I have completed Money Laundering Training, Traps

23 and Concealed Compartments Training, and other various courses that have familiarized

24 me with investigations of drug trafficking organizations, methods of importation and

25 distribution of controlled substances, and financial investigations.

26      4.      During the course of my law enforcement career, I have been involved in

27 investigations of narcotics offenses, including offenses involved in this current

28 investigation.  I have participated in criminal investigations of drug-trafficking

AFFIDAVIT OF SPECIAL AGENT LANDIS                 – 1 –

1  organizations (DTOs), ranging from street-level dealers to larger dealers, including
2  Mexican-based DTOs.  These investigations have included the unlawful importation,
3  possession with intent to distribute, and distribution of controlled substances; the related
4  laundering of monetary instruments; the conducting of monetary transactions involving
5  the proceeds of specified unlawful activities; and conspiracies associated with these
6  offenses.

7       5.       As noted above, prior to my employment with the DEA, I was employed
8  with the United States Border Patrol as a Border Patrol Agent for more than six years.
9  During my time as a Border Patrol Agent, I intercepted narcotics from narcotics
10  traffickers/smugglers as part of my regular duties.  Furthermore, I assisted the DEA and
11  Homeland Security Investigations with mid- and upper-level drug investigations in at
12  least fifteen cases.  My experience as a Border Patrol Agent familiarized me with the
13  methods used by narcotics traffickers/smugglers to transport narcotics to transport
14  narcotics, firearms, and bulk currency into and out of the United States.

15                          **PURPOSE OF AFFIDAVIT**

16       6.       This Affidavit is submitted in support of an application for a search warrant
17  under Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A)
18  to require Facebook to disclose to the government records and other information in its
19  possession, pertaining to the subscriber or customer associated with the following six
20  Facebook accounts (referred to as SUBJECT ACCOUNT 1, SUBJECT ACCOUNT 2,
21  SUBJECT ACCOUNT 3, SUBJECT ACCOUNT 4, SUBJECT ACCOUNT 5, and
22  SUBJECT ACCOUNT 6):

23            a.       Facebook user ID /katherine.thomas.104418 registered under the
24  name KATHERINE THOMAS (SUBJECT ACCOUNT 1);

25            b.       Facebook user ID /juanandres.castrovalenzuela registered under the
26  name JUAN ANDRES CASTRO VALENZUELA (SUBJECT ACCOUNT 2);

27            c.       Facebook user ID /diego.juareguicastro registered under the name
28  FLORENCIO CASTRO VALENZUELA (SUBJECT ACCOUNT 3);

1         d.     Facebook user ID /annel.baker.5 registered under the name ANNEL

2 BAKER (SUBJECT ACCOUNT 4);

3         e.     Facebook user ID /rebeca.spencer.1 registered under the name

4 REBECA SPENCER (SUBJECT ACCOUNT 5); and

5         f.     Facebook user ID /alissa.keyser registered under the name ALISSA

6 KEYSER (SUBJECT ACCOUNT 6).

7       7.     All of the requested information is stored at premises owned, maintained,

8 controlled, or operated by Facebook, a social networking company headquartered in

9 Menlo Park, California.  The information to be searched is described in the following

10 paragraphs and in Attachment B.  This is the second application for a search warrant for

11 SUBJECT ACCOUNT 1 in this investigation and the first application for a search

12 warrant for SUBJECT ACCOUNT 2, SUBJECT ACCOUNT 3, SUBJECT ACCOUNT

13 4, SUBJECT ACCOUNT 5 and SUBJECT ACCOUNT 6.

14                   **FACEBOOK INFORMATION STORAGE**

15       8.     I am aware from my experience and training, and consultation with other

16 investigators, of the following information about Facebook:

17       9.     Facebook owns and operates a free-access social networking website of the

18 same name, accessed at http://www.facebook.com.  Facebook allows its users to establish

19 accounts with Facebook, and users can then use their accounts to share written news,

20 photographs, videos, and other information with other Facebook users, and sometimes

21 with the general public.

22      10.     Facebook asks users to provide basic contact and personal identifying

23 information to Facebook, either during the registration process or thereafter.  This

24 information may include the user's full name, birth date, gender, contact e-mail

25 address(es), Facebook passwords, Facebook security questions and answers (for

26 password retrieval), physical address (including city, state, and zip code), telephone

27 numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a

28 user identification number to each account.

11.     I know from speaking with other law enforcement that "cookies" are small files placed by a server (such as those used by Facebook) on a device to track the user and potentially verify a user's authentication status across multiple sites or webpages.  This cookie could be unique to a particular account (e.g., the Facebook account) or to a given device (e.g., the particular phone used to access the Facebook account).  The next time a user visits a particular site or server, the server will ask for certain cookies to see if the server has interacted with that user before.  Cookies can also be used to determine "machine cookie overlap," or multiple accounts that have been accessed by the same individual machine (e.g., two Facebook accounts that have been accessed on the same phone).  The machine cookie overlap thus allows Facebook to track accounts that are "linked" to each other because the same user account (username on a computer) on the same device accessed multiple Facebook accounts.  This can identify either multiple Facebook accounts used by the same person or used by different people sharing the same user account and device.  In either case, the machine cookie overlap means that the users of the linked accounts are the same person or two people in close proximity to each other (by virtue of them using the same device).

12.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

13.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or

1  herself, to particular Facebook users, or to anyone with access to the Internet, including

2  people who are not Facebook users.  A Facebook user can also create "lists" of Facebook

3  friends to facilitate the application of these privacy settings.  Facebook accounts also

4  include other account settings that users can adjust to control, for example, the types of

5  notifications they receive from Facebook.

6       14.    Facebook users can create profiles that include photographs, lists of

7  personal interests, and other information.  Facebook users can also post "status" updates

8  about their whereabouts and actions, as well as links to videos, photographs, articles, and

9  other items available elsewhere on the Internet.  Facebook users can also post information

10  about upcoming "events," such as social occasions, by listing the event's time, location,

11  host, and guest list.  In addition, Facebook users can "check in" to particular locations or

12  add their geographic locations to their Facebook posts, thereby revealing their geographic

13  locations at particular dates and times.  A particular user's profile page also includes a

14  "Wall," which is a space where the user and his or her "Friends" can post messages,

15  attachments, and links that will typically be visible to anyone who can view the user's

16  profile.

17       15.    Facebook allows users to upload photos and videos.  It also provides users

18  the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is

19  tagged in a photo or video, he or she receives a notification of the tag and a link to see the

20  photo or video.  For Facebook's purposes, the photos and videos associated with a user's

21  account will include all photos and videos uploaded by that user that have not been

22  deleted, as well as all photos and videos uploaded by any user that have that user tagged

23  in them.

24       16.    Facebook users can exchange private messages on Facebook with other

25  users.  These messages, which are similar to e-mail messages, are sent to the recipient's

26  "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well

27  as other information.  Facebook users can also post comments on the Facebook profiles

28  of other users or on their own profiles; such comments are typically associated with a

1  specific posting or item on the profile.  In addition, Facebook has a Chat feature that

2  allows users to send and receive instant messages through Facebook.  These chat

3  communications are stored in the chat history for the account.  Facebook also has a Video

4  Calling feature, and although Facebook does not record the calls themselves, it does keep

5  records of the date of each call.

6       17.    If a Facebook user does not want to interact with another user on Facebook,

7  the first user can "block" the second user from seeing his or her account.

8       18.    Facebook has a search function that enables its users to search Facebook for

9  keywords, usernames, or pages, among other things.

10       19.    Each Facebook account has an activity log, which is a list of the user's

11  posts and other Facebook activities from the inception of the account to the present.  The

12  activity log includes stories and photos that the user has been tagged in, as well as

13  connections made through the account, such as "liking" a Facebook page or adding

14  someone as a friend.  The activity log is visible to the user but cannot be viewed by

15  people who visit the user's Facebook page.

16       20.    Facebook Notes is a blogging feature available to Facebook users, and it

17  enables users to write and post notes or personal web logs ("blogs"), or to import their

18  blogs from other services, such as Xanga, LiveJournal, and Blogger.

19       21.    In addition to the applications described above, Facebook also provides its

20  users with access to thousands of other applications on the Facebook platform.  When a

21  Facebook user accesses or uses one of these applications, an update about that the user's

22  access or use of that application may appear on the user's profile page.

23       22.    Some Facebook pages are affiliated with groups of users, rather than one

24  individual user.  Membership in the group is monitored and regulated by the

25  administrator or head of the group, who can invite new members and reject or accept

26  requests by users to enter.  Facebook can identify all users who are currently registered to

27  a particular group and can identify the administrator and/or creator of the group.

28  Facebook uses the term "Group Contact Info" to describe the contact information for the

1  group's creator and/or administrator, as well as a PDF of the current status of the group
2  profile page.

3      23.    Facebook uses the term "Neoprint" to describe an expanded view of a given
4  user profile. The "Neoprint" for a given user can include the following information from
5  the user's profile:  profile contact information; News Feed information; status updates;
6  links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists,
7  including the friends' Facebook user identification numbers; groups and networks of
8  which the user is a member, including the groups' Facebook group identification
9  numbers; future and past event postings; rejected "Friend" requests; comments; gifts;
10  pokes; tags; and information about the user's access and use of Facebook applications.

11      24.    Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP
12  address. These logs may contain information about the actions taken by the user ID or IP
13  address on Facebook, including information about the type of action, the date and time of
14  the action, and the user ID and IP address associated with the action.  For example, if a
15  user views a Facebook profile, that user's IP log would reflect the fact that the user
16  viewed the profile, and would show when and from what IP address the user did so.

17      25.    Social networking providers like Facebook typically retain additional
18  information about their users' accounts, such as information about the length of service
19  (including start date), the types of service utilized, and the means and source of any
20  payments associated with the service (including any credit card or bank account number).
21  In some cases, Facebook users may communicate directly with Facebook about issues
22  relating to their accounts, such as technical problems, billing inquiries, or complaints
23  from other users.  Social networking providers like Facebook typically retain records
24  about such communications, including records of contacts between the user and the
25  provider's support services, as well as records of any actions taken by the provider or
26  user as a result of the communications.

27      26.    Therefore, the computers of Facebook are likely to contain all the material
28  described above, including stored electronic communications and information concerning

1  subscribers and their use of Facebook, such as account access information, transaction

2  information, and other account information.  I believe such information is likely to

3  constitute evidence of the drug trafficking crimes currently under investigation.

4  **SUMMARY OF PROBABLE CAUSE**

5      27.    The information set forth in this Affidavit consists of information I have

6  gathered and observed firsthand through the course of this investigation to date, as well

7  as information relayed to me by other law enforcement personnel, my review of law

8  enforcement reports, interviews of witnesses, and my review and analysis of toll records.

9  Since I am submitting this Affidavit for the limited purpose of obtaining authorization to

10  search SUBJECT ACCOUNT 1, SUBJECT ACCOUNT 2, SUBJECT ACCOUNT 3,

11  SUBJECT ACCOUNT 4, SUBJECT ACCOUNT 5 and SUBJECT ACCOUNT 6 as

12  described herein, I have not included every fact known to me concerning this

13  investigation.  I have set forth only the facts that I believe are essential to establish the

14  necessary foundation for the issuance of such warrant.

15  ***Information Gathered From CS***

16      28.    During the month of August 2017, the Bremerton Police Department

17  (BPD) Special Operations Group (SOG) was investigating a suspected local heroin dealer

18  reportedly purchasing heroin from a Hispanic individual in the Snohomish and King

19  County areas.  SOG conducted controlled buys from the local dealer, and eventually

20  detained him/her during a traffic stop.  During the stop, detectives discovered a large

21  amount of cash, which the dealer claimed he/she owed as a drug "front" to a Mexican

22  drug trafficking organization (DTO).  The dealer then agreed to cooperate with law

23  enforcement and was signed up as a Confidential Source (CS).

24      29.    The CS advised SOG that he/she had been selling various controlled

25  substances for several years. According to the CS, he/she has been in contact with a

26  group of Mexicans who sell heroin in the Puget Sound region. Within that organization,

27  the CS connected with a prominent drug trafficker whom the CS knew as "Juan" or

28

1    "Jose." The CS believes the individual he/she knew as "Juan" was the local leader of the

2    drug distribution at that time, and was later promoted to a larger role in the DTO.

3        30.   BPD Detective (Det) Jordan Ejde located a Facebook account under the

4    name of "Juan Andres CASTRO Valenzuela" (SUBJECT ACCOUNT 2) that the CS and

5    other local suspected drug dealers were associated with.  Det. Ejde questioned the CS

6    about the account and the CS confirmed CASTRO was the male whom he/she referred to

7    as "Juan" or "Jose."  The CS also showed Det. Ejde messages confirming that CASTRO

8    had been in recent contact with the CS, using SUBJECT ACCOUNT 2.  According to the

9    CS and the Facebook data he/she provided, he/she had been talking to CASTRO via

10   Facebook Messenger for purposes of making drug transactions since approximately June

11   of 2016.

12       31.   A review of the CS's Facebook account showed CASTRO also contacted

13   the CS from additional Facebook accounts under the names of "REBECA SPENCER"

14   (SUBJECT ACCOUNT 5), "ANNEL BAKER" (SUBJECT ACCOUNT 4), and

15   "KATHERINE THOMAS" (SUBJECT ACCOUNT 1).  A review of the CS's phone

16   showed CASTRO also used Mexican phone numbers 52-668-199-4039, 52-668-248-

17   4230, 52-668-225-5890, and 52-668-199-5533 to communicate with the CS via text

18   message and voice calls.  SUBJECT ACCOUNT 1 and phone number 52-668-199-4039

19   were CASTRO's most current methods of drug related communications with the CS (at

20   that time).

21       32.   Det. Ejde and Special Agent (SA) Anthony DelVecchio have confirmed

22   CASTRO's identity via the Washington State Department of Licensing (WADOL).

23   Specifically, CASTRO's WADOL photograph matches that of the individual on

24   SUBJECT ACCOUNT 2.  Furthermore, according to a law enforcement database,

25   CASTRO was involved as a suspected "cell head" for heroin distribution in the Everett

26   area during a DEA investigation that took place in 2012.  SA DelVecchio researched this

27   prior DEA case and found that CASTRO was, in fact, the primary target of investigation

28   within that case.

33.     Based on how CASTRO first interacted with the CS, I believe CASTRO uses SUBJECT ACCOUNT 2 for initially contacting his suspected drug customers. When CASTRO first contacted the CS via Facebook Messenger, he used SUBJECT ACCOUNT 2. After a brief introduction utilizing SUBJECT ACCOUNT 2, CASTRO switched over to a more discrete account(s), e.g., SUBJECT ACCOUNT 4 and/or SUBJECT ACCOUNT 5, for the actual organizing of the suspected drug transactions. I believe that by having a picture of himself [CASTRO] as the account user for SUBJECT ACCOUNT 2, it helps his customers recognize him in addition to him building a rapport with them.

34.     CASTRO has used SUBJECT ACCOUNT 1, SUBJECT ACCOUNT 2, SUBJECT ACCOUNT 4, SUBJECT ACCOUNT 5, and SUBJECT ACCOUNT 6, as well as various telephone numbers, to set up drug deals with the CS. According to the CS, CASTRO typically arranges the transaction, but sends a Hispanic male to conduct the transaction with the CS. The CS explained that he/she has met several different Hispanic males across the Puget Sound region to conduct these drug transactions. The CS told law enforcement that he/she typically purchased 1-2 ounces of heroin several times per week.

35.     Recently, after talking to CASTRO and arranging for a heroin purchase, the CS met with a Hispanic male the CS knows as "Miguel." Investigators identified "Miguel" as Jesus Rene SARMIENTO Valenzuela by comparing surveillance photographs of CASTRO DTO members, SARMIENTO's Facebook account, and his visa information from the United States Department of Homeland Security.

36.     Utilizing the CS, SOG has conducted seven controlled purchases of suspected heroin from CASTRO through SARMIENTO, totaling approximately 90.4 grams.[1] Prior to and after each controlled purchase of heroin, detectives searched the CS

---

[1] The first six controlled buys performed by SOG totaled approximately 90.4 grams of suspected heroin. The seventh buy SOG conducted was done in conjunction with DEA. 46.2 gross grams of suspected heroin was seized

1   and his/her vehicle, and provided the CS with pre-recorded SOG funds to make each

2   purchase of heroin.  During the course of each controlled purchase, investigators

3   maintained surveillance on the CS.  After each purchase, detectives tested the suspected

4   heroin using a NIK test kit with presumptive positive results for the presence of heroin,

5   and then processed the heroin according to SOG's policies and procedures.  For the

6   second through sixth controlled purchases, detectives recorded the buys with a covert

7   surveillance camera.

8   ***Undercover Controlled Purchase #1 Utilizing SUBJECT ACCOUNT 1***

9        37.     In early November 2017, SOG provided DEA agents, including an

10  undercover agent (the UC) with the various phone numbers and Facebook accounts they

11  believed CASTRO and SARMIENTO used for drug trafficking purposes.

12       38.     On November 14, 2017, the CS sent the UC an invitation to join a group

13  Facebook Messenger chat session, which linked the UC in communication with

14  SUBJECT ACCOUNT 1.  The following is a transcript of the discussion between

15  CASTRO and the UC.  During the conversation, the UC used the terms "brown" and

16  "piece."  From training and experience, agents know heroin to be referred to as "brown"

17  and an ounce to be referred to as "piece."  These terms are common language within the

18  drug community, and in order to appear knowledgeable and experienced, the UC used

19  them.

20       •     UC:  "Hello fellas, appreciate the intro"

21       •     CASTRO:  "How are you?"

22       •     UC:  "Besides all the rain, everything is good. Yourself"

23       •     CASTRO:  "good..."

24       •     UC:  "Up for some business this week?"

25       •     CASTRO:  [Thumbs up graphic]

26

27   _____

28   during this seventh purchase, for a total of 136.6 gross grams between the first seven controlled purchases from this
     DTO.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

- UC: "I'd like two pieces of brown, what would that cost"
- CASTRO: "look, 1 is $1150...but if you want buy 2 or 3 is $1075...if you buy 4 or more is $1,025"
- UC: "I want 2. Can we do it Thursday?"
- CASTRO: "ok"
- CASTRO: "yes"
- UC: "Where do you want me to go?"
- CASTRO: "Kent, maybe Tacoma..."
- UC: "OK"

39.     On November 16, 2017, agents conducted an undercover purchase of heroin from SARMIENTO at the Krispy Kreme at 4302 Tacoma Mall Boulevard, Tacoma, Washington.  The UC contacted CASTRO on 52-668-199-4039 (Target Telephone 1 or TT1) and through SUBJECT ACCOUNT 1 prior to this transaction in order to facilitate the meeting.  The UC also contacted SARMIENTO on his telephone, 253-398-5638 (Target Telephone 3 or TT3), prior to and during this transaction.  The following conversations are noteworthy communications leading up to the controlled purchase of heroin from CASTRO through SARMIENTO, and include what I believe to be pertinent interactions with SARMIENTO (known to the UC as "Miguel"), to include statements SARMIENTO made to the UC during the undercover purchase on November 16, 2017, obtained through the UC's use of an electronic monitoring device that recorded the audible interactions between the UC and SARMIENTO.

40.     From 10:24 a.m. to 10:31 a.m., the UC and CASTRO, using SUBJECT ACCOUNT 1, had the following Facebook messenger conversation:

- CASTRO: "send me you phone number please"
- UC: "No problem, 360-362-8770"
- CASTRO: "ok...I will send text to you"
- UC: "Sounds good"

41.     At 10:36 a.m., the UC received a text message from TT1.  Between 10:36 a.m. and 11:16 a.m., the UC and CASTRO had the following text message conversation:

- CASTRO: "I'm in way to camp with my family, my phone service will be very bad at next hour to tomorrow..."
- CASTRO: "if you need something send text to my cousin Miguel please...253-398-5638"
- UC: "Got it thanks enjoy the camping trip amigo"
- UC: "I'll text him today for sure"
- UC: "Will your guy still be able to get me the 2 today?"
- CASTRO: "Hey"
- UC: "Hey, just asking if your guy can still do 2 today?"
- CASTRO: "What number are you sending me messages from?"
- CASTRO: "but yes, he is ready for you"
- UC: "I'm sending messages from my cell"

42.     At 11:15 a.m., the UC texted "Miguel" at TT3. From 11:15 a.m. to 11:35 a.m., the UC and "Miguel" had the following text message conversation:

- UC: "Hey Miguel, this is Steve. I was told to talk to you about doing some business today. Are you good for 2 this afternoon?"
- Miguel: "Yes ok"
- Miguel: "Good"
- Miguel: "at that time are you come by the material"
- UC: "I don't know what time I'll be up there, but can I get 2?"
- Miguel: "Ok"
- Miguel: "I can post-1 p.m."
- UC: "Good"

43.     From 1:24 p.m. to 1:42 p.m., the UC and "Miguel" had the following conversation via text message:

1    • Miguel: "Where are you"

2    • UC: "I'm in Olympia, you want to meet in Tacoma?"

3    • Miguel: "Its ok"

4    • UC: "Do you know where the mall is? I can go there easy."

5    • Miguel: "How long you are there"

6    • Miguel: "Yes in Tacoma mall ok"

7    • UC: "30 minutes"

8    • UC: "Meet at the Krispy Kreme?"

9    • Miguel: "My gps tell 50 min its ok mh friend"

10   • UC: "Sure amigo, that's ok"

11   44.    About an hour later, the UC arrived at 4302 Tacoma Mall Boulevard,

12   Tacoma, Washington (the Krispy Kreme address), and parked facing south.  At 2:33

13   p.m., "Miguel" texted the UC that, "In 10 min im, there."  Between 2:36 p.m. and 2:41

14   p.m., the UC and "Miguel" had the following conversation via text message:

15   • UC: "I am parked in a truck at the place"

16   • Miguel: "What is your car"

17   • UC: "Blue Ford F-150"

18   • Miguel: "Ok"

19   • Miguel: "I have red car getta"

20   • Miguel: "Red car"

21   • Miguel: "In 2 min"

22   • UC: "Ok"

23   45.    Minutes later, the UC observed a red Volkswagen Jetta drive into the

24   Krispy Kreme and park nearby.  A Hispanic male, mid-thirties, with a beard and dark

25   sweatshirt, motioned for the UC to get into the Jetta.  The UC acknowledged, exited his

26   vehicle, and got into the Jetta's front passenger seat.  The Hispanic male introduced

27   himself as "Miguel," the UC introduced himself as "Steve," and the men shook hands.

28

AFFIDAVIT OF SPECIAL AGENT LANDIS              – 14 –

1 | They made small talk about the bad traffic in the area, and then "Miguel" asked the UC if
2 | the deal was for "two pieces." The UC nodded his head and handed "Miguel" $2,150 in
3 | buy money.

4 |     46.    The UC watched "Miguel" count the money, and confirmed the total
5 | amount of $2,150. "Miguel" gave the UC a plastic baggie that contained suspected
6 | heroin. Shortly thereafter, "Miguel" nodded toward the door and told the UC that he
7 | would "see him next time." Agents transported the suspected heroin to the DEA Tacoma
8 | Resident Office where it was weighed at approximately 87.4 gross grams.

9 | ***Undercover Controlled Purchase #2 Utilizing SUBJECT ACCOUNT 1***

10 |     47.    On November 27, 2017, the UC received a text message from CASTRO
11 | (TT1). During this conversation, the UC and CASTRO discussed a future drug
12 | transaction that would later occur on November 30, 2017. The UC said, "I am trying to
13 | get money together for 4...," meaning he wanted to purchase four ounces of heroin. The
14 | UC and CASTRO (TT1) had the following text message conversation:

15 |     •    CASTRO: "amigo, everything it's ok?"
16 |     •    UC: "Amigo, everything is good here. Just got back home. How are
17 |        you doing? This is Steve"
18 |     •    CASTRO: "ok..."
19 |     •    UC: "Can we do business Thursday?"
20 |     •    CASTRO: "yes"
21 |     •    UC: "Excellent!"
22 |     •    UC: "I am trying to get money together for 4, would that be ok?"
23 |     •    CASTRO: "ok"
24 |     •    UC: "Cool!"
25 |     •    UC: "Anymore camping trips planned amigo?"

26 |     48.    On November 30, 2017, agents conducted an undercover purchase of
27 | heroin from CASTRO, through SARMIENTO, at the Buffalo Wild Wings at 2005 South
28 |

1  320th Street, Federal Way, Washington.  The following are noteworthy communications

2  between the UC and CASTRO while setting up the second controlled purchase, and the

3  UC's interactions with SARMIENTO, to include statements SARMIENTO made to the

4  UC during the undercover purchase on November 30, 2017, obtained through the UC's

5  use of an electronic monitoring device that recorded the audible interactions between the

6  UC and SARMIENTO.

7       49.  At 1:01 p.m., the UC initiated a Facebook Messenger conversation with

8  CASTRO through SUBJECT ACCOUNT 1. The following transcript reflects the

9  discussion between 1:01 p.m. and 1:26 p.m.:

10       •  UC: "Hey Amigo, I was able to get the money. Are we still good for

11          4 today?"

12       •  CASTRO: "yes"

13       •  UC: "Very nice, should I contact Miguel like last time?"

14       •  CASTRO: "yes, or to me..."

15       •  UC: "Ok, where would you like me to go?"

16       •  CASTRO: "Deppend what time you can go"

17       •  CASTRO: "where you live?"

18       •  UC: "I live near Olympia, south of Tacoma"

19       •  CASTRO: "ok"

20       •  UC: "I can get to Tacoma Mall like last time. What do you think?"

21       •  CASTRO: "what time?"

22       •  UC: "2:30?"

23       •  CASTRO: "2:30 you will leave? or 2:30 you will be at Tacoma?"

24       •  UC: "I will be at Tacoma"

25       •  CASTRO: "Ok, go"

26       •  UC: "Ok"

27

28

50.     Using SUBJECT ACCOUNT 1, CASTRO told the UC that he changed the meet location from the Tacoma Mall to the Buffalo Wild Wings at 2005 South 320th Street, Federal Way, Washington 98003.  The following conversation from 2:44 p.m. to 2:46 p.m. includes the location change and subsequent acknowledgement by the UC:

- CASTRO: "2005 South 320th Street, Federal Way, WA 98003, EE. UU.[2] is a Buffalo wild wings"
- CASTRO: "please go there"
- UC: "Ok amigo, headed that way"

51.     From 2:59 p.m. to 3:43 p.m., the UC and CASTRO, using SUBJECT ACCOUNT 1, had the following conversation via Facebook messenger:

- CASTRO: "how long you will be there?"
- UC: "15 minutes"
- CASTRO: "ok"
- CASTRO: "You're driving same car?"
- UC: "Yes"
- UC: "Same car for you?"
- CASTRO: "same too"
- CASTRO: "my cousin is there waiting for you"
- UC: "Ok, good. I'll hurry up."
- CASTRO: "how long?"
- CASTRO: "??"
- UC: "5 minutes"
- CASTRO: "ok"
- UC: "Where is he parked at Buffalo Wild Wings?"
- CASTRO: "yes, just front at mall door."

[2] I know that "EE. UU." is a Spanish-language abbreviation for "Los Estados Unidos," i.e., the United States.

AFFIDAVIT OF SPECIAL AGENT LANDIS                    – 17 –

1       •     UC: "ok"

2       •     CASTRO: "you're there??"

3       •     CASTRO: "??"

4       •     UC: "yes, off the exit and am there."

5       •     CASTRO: "ok ok"

6       •     CASTRO: "hey what's happening??"

7       •     UC: "I'm there"

8       •     CASTRO: "ok"

9       •     CASTRO: "where you are parked?"

10    52.     The UC then drove into the parking area of the Buffalo Wild Wings, and

11 parked. The UC received two calls from CASTRO. Of note, Facebook Messenger has

12 telephone call capabilities as well as video chat. The first phone call came through

13 Facebook Messenger under SUBJECT ACCOUNT 1, and the second call came from

14 TT1. The UC ignored the calls and asked CASTRO, through SUBJECT ACCOUNT 1,

15 "where is he?" CASTRO responded that his cousin was "walking to the car."

16    53.     Moments later, the UC identified SARMIENTO walking towards the UC's

17 vehicle. SARMIENTO was wearing a black baseball cap, dark jacket and sweater, with

18 black pants. The UC watched SARMIENTO move alongside the passenger side of the

19 vehicle, and enter the front passenger seat. The UC took $4,100 in buy money, wrapped

20 in a plastic bag, from his sweatshirt pocket, and gave it to SARMIENTO, who began

21 counting it. During his count, the UC asked SARMIENTO what he had done over the

22 holiday. SARMIENTO smiled, and responded that he had partied with friends at the

23 "store." The UC asked if he worked at the "store," and SARMIENTO said that he did.

24 Once SARMIENTO finished counting, he looked at the UC and stated, "$4,300?" The

25 UC responded "$4,100," to which SARMIENTO nodded his head.

26    54.     SARMIENTO then motioned with his hand to drive forward. The UC

27 nodded and began to drive slowly through the parking lot until SARMIENTO told the

28

1  UC to stop.  SARMIENTO then reached near his waist and took out a brown bundle of

2  suspected heroin, tightly wrapped in plastic.  SARMIENTO placed the brown bundle in

3  the plastic bag the money had previously been in and then left it on the floor near the

4  middle console of the vehicle.  SARMIENTO and the UC parted ways after the

5  exchange.  Agents transported the suspected heroin to the TRO where it was weighed at

6  approximately 136.1 gross grams.

7        55.    Shortly after the UC and SARMIENTO parted ways, CASTRO sent a large

8  "thumbs up" graphic to the UC via SUBJECT ACCOUNT 1, indicating a successful drug

9  transaction.

10        56.    Later that afternoon, the UC attempted to call SUBJECT ACCOUNT 1.

11  CASTRO did not answer the call, but instead initiated a text conversation through

12  SUBJECT ACCOUNT 1 that lasted from 5:14 p.m. to 5:26 p.m. The following transcript

13  reflects this conversation:

14          •    CASTRO:  "what's up??"

15          •    UC:  "Nothing important, just appreciate your cousin finding me

16              today. It was good"

17          •    CASTRO: [Thumbs up graphic]

18  ***Undercover Controlled Purchase #3 Utilizing SUBJECT ACCOUNT 1***

19        57.    On December 15, 2017, at 11:16 a.m., the UC attempted to call CASTRO

20  via SUBJECT ACCOUNT 1 on Facebook Messenger.  CASTRO did not answer the call,

21  but typed a response at 11:17 a.m.  The following transcript reflects the ensuing

22  conversation between 11:17 a.m. to 12:34 p.m.:

23          •    CASTRO: "hey, what's up?"

24          •    UC: "hey amigo, can we do some business"

25          •    CASTRO: "yes..."

26          •    UC: "I'd like to get some powder today, probably 2 for customers in

27              Ohio. I'm going there to visit family for the holidays."

28

- CASTRO: "only powder??"
- UC: "Yes, it's what they asked for. What is the price difference?"
- UC: "They like brown powder out there"
- CASTRO: "its ok"
- CASTRO: "what time you think that will go??"
- UC: "I'm ready now. Where do you want me to go?"
- CASTRO: "same place"
- UC: "Buffalo Wild Wings?"
- CASTRO: "please go to North, maybe at Kent...I will send address when you are at 20 minutes away"
- UC: "ok amigo"
- UC: "same price for 2?"
- CASTRO: "yes, $2,150"
- UC: "ok"
- CASTRO: "you're on way??"
- UC: "yes"
- CASTRO: [Thumbs up graphic]

58.     At approximately 12:50 p.m., the UC called TT1.  CASTRO answered the call and asked, "Who is this?"  The UC identified himself, and informed CASTRO that he was 20 minutes away.  CASTRO responded, "Send text please," and terminated the call.

59.     At 12:53 p.m., the UC reinitiated the Facebook Messenger conversation with CASTRO on SUBJECT ACCOUNT 1.  The following transcript reflects the discussion between 12:53 p.m. to 1:02 p.m.:

- UC: "I am 20 minutes away"
- CASTRO: "ok, you called me?"
- UC: "Yes, I couldn't text while driving."

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1        •    UC: "Where do you want me to go?"

2        •    CASTRO: "26301 104th Avenue SE, Kent, Washington 98030, EE.

3             UU."

4        •    CASTRO: "is a target"

5        •    CASTRO: "let me know when you are at 10 minutes away"

6        •    UC: "Ok, on my way"

7        •    CASTRO: "how long you will be there?"

8        •    UC: "25 minutes, traffic is bad."

9        •    CASTRO: "Ok, let me know when you are at 10 minutes away

10            please"

11        •    UC: "Ok"

12      60.    From 1:24 p.m. to 1:26 p.m., the UC and CASTRO had the following

13 conversation via SUBJECT ACCOUNT 1:

14        •    CASTRO: "you're close??"

15        •    UC: "Yes, about 10 minutes"

16        •    CASTRO: "Ok"

17      61.    At approximately 1:35 p.m., the UC pulled into the Target store at 26301

18 104th Avenue SE, Kent, Washington and parked.  At 1:37 p.m., the UC informed

19 CASTRO via SUBJECT ACCOUNT 1 that he was "at the Target, parked near Target

20 sign in parking lot, same vehicle."

21      62.    At approximately 1:45 p.m., the UC observed a red 2008 Volkswagen Jetta,

22 bearing Washington license BFX7429 (Target Vehicle 1 or TV1) pull up and park next to

23 him.  The UC exited his vehicle, got into (TV1's) front passenger seat, and greeted

24 SARMIENTO.  SARMIENTO acknowledged the UC, shook his hand, and produced a

25 small brown bundle wrapped tightly in plastic.  The UC took the bundle, thanked

26 SARMIENTO, and handed him $2150 in buy money.  SARMIENTO put the money in

27 his pocket without counting, and signaled the UC to leave.  The UC indicated

28

1  SARMIENTO could count the money, but SARMIENTO stated that he "trusted the UC,"
2  and they bumped fists as the UC was exiting the vehicle.

3      63.    At 1:54 p.m., CASTRO sent a large "thumbs up" graphic to the UC via
4  SUBJECT ACCOUNT 1 on Facebook messenger.

5      64.    At 4:22 p.m., the UC attempted to call CASTRO using SUBJECT
6  ACCOUNT 1. CASTRO did not pick up the call, but typed a response at 4:23 p.m. The
7  following transcript reflects the conversation through SUBJECT ACCOUNT 1 from 4:23
8  p.m. to 4:24 p.m.:

9      • CASTRO: "what's up??"

10     • UC: "Sorry amigo, pushed the wrong button. Just wanted to say
11       everything went well. Good deal."

12     • CASTRO: [thumbs up graphic]

13  **Federal Search Warrant for SUBJECT ACCOUNT 1**

14     65.    On January 3, 2018, I obtained a search warrant from the United States
15  District Court for the Western District of Washington for SUBJECT ACCOUNT 1,
16  believed to be used by CASTRO in order to network and facilitate suspected drug
17  transactions. On January 17, 2018, during a search of the Facebook Messenger portion of
18  the returned warrant materials, I found numerous suspected drug conversations between
19  CASTRO and individuals whom agents believe are his drug customers.

20     66.    One of the conversations on Facebook Messenger/SUBJECT ACCOUNT 1
21  showed CASTRO and a suspected drug distributor under the Facebook account "ALEX
22  HUBLY" organizing a suspected drug transaction on December 29, 2017. During one of
23  the conversations between the two, CASTRO told HUBLY that he would send his cousin
24  who would be driving a "gray Civic."[3] The following is a transcript of the

25

26

---

27  [3] a.    Agents later identified the vehicle (Target Vehicle 2, or TV2) as a 2004 grey Honda Civic, bearing
     Washington license plate BEX3964 and vehicle identification number (VIN) JHMES96664S021704. I believe
28  Octavio COTA Lopez, a suspected drug distributor for the CASTRO DTO, is the user of TV2. On February 5,
     2018, United States Magistrate Judge J. Richard Creatura authorized the GPS tracking of TV2 for a 45-day period.

AFFIDAVIT OF SPECIAL AGENT LANDIS                – 22 –

aforementioned conversation between CASTRO and the ALEX HUBLY account from 5:58 p.m. to 7:35 p.m.:

- HUBLY: "will you be ready tonight?"
- CASTRO: "yes ill be ready in like 25 min"
- CASTRO: "My cousin will start your way to puyallup at next 10 minutes"
- HUBLY: "Ok I will have all the money by like 6 50.."
- CASTRO: "how many money you think that will have??"
- HUBLY: "I will have 1700"
- HUBLY: "I'm in puyallup"
- CASTRO: "for sure??"
- HUBLY: "How did you know I was in Puyallup?"
- CASTRO: "my cousin will go to puyallup with other client?"
- CASTRO: "1700 for sure??"
- CASTRO: "??"
- HUBLY: "Yes for sure for sure"
- CASTRO: "ok"
- HUBLY: "didnt know there was someone else that had product in Puyallup what is there bane."
- HUBLY: "There name**"
- HUBLY: "And will you make sure it is the same good stuff he has givin me the last 2 times please"
- CASTRO: "yes, will be the same, I promise"
- HUBLY: "K"
- HUBLY: "How long"
- CASTRO: "send me you address please"
- HUBLY: "2101 N Meridian, Puyallup, WA 98371"

— 23 —

- HUBLY: "I need him asap"
- CASTRO: "room # ??"
- HUBLY: "Its room 225 but I have to meet him outside cause you can't get in without a card"
- CASTRO: "ok.. he says 25 minutes will be there"
- HUBLY: "Tell him to park on the side closest to the car dealership"
- HUBLY: "ok"
- CASTRO: "8 minutes, he is driving a gray Civic"
- HUBLY: "ok"
- HUBLY: "Park in back corner"
- CASTRO: "ok"
- CASTRO: "Text when he is here"
- HUBLY: "gray Civic"
- CASTRO: "he is there"
- CASTRO: "close to the dealership"
- CASTRO: "he is Parker between at with Ford truck and blue GMC truck"
- HUBLY: "Found him"
- CASTRO: [Thumbs up graphic]

67.     During this conversation, I believe CASTRO and HUBLY arranged a drug transaction. Specifically, I believe HUBLY purchased $1,700 worth of high purity heroin (likely a piece-and-a-half) from CASTRO and CASTRO sent Arturo FRIAS Cabellos (aka "Luis) and/or Octavio COTA Lopez in TV2 to deliver the drugs to HUBLY at his referenced address in Puyallup, Washington. Agents have previously identified FRIAS and COTA as suspected drug couriers for the CASTRO DTO. I believe CASTRO was specific in describing TV2 on two separate occasions because HUBLY had typically done business with CASTRO's subordinates in a different vehicle, i.e.,

1  TV1.  I believe CASTRO described TV2 to HUBLY in order to make sure HUBLY

2  identified the correct vehicle in the parking lot.  The last message HUBLY sent to

3  CASTRO, as noted above ("Found him"), was sent at just about 7:35 p.m.  Examination

4  of mounted surveillance camera footage at 22025 100th Avenue Southeast (a suspected

5  DTO stash house) from December 29, 2017, showed TV2 returned to 22025 100th

6  Avenue Southeast at approximately 8:20 p.m.  Agents believe TV2's arrival at this

7  suspected CASTRO DTO stash house (and residence for FRIAS and COTA) was

8  consistent with the driver of TV2 having taken no more than ten minutes to conduct the

9  transaction with HUBLY in Puyallup, Washington, and then drove back to Kent,

10  Washington.  This belief is based on agents' knowledge of typical drug transactions

11  (including transactions specifically with this DTO) in conjunction with general travel

12  times and traffic patterns between Kent and Puyallup during Friday evenings (like

13  December 29, 2017).

14       68.     During a search of the "Cookies" portion of SUBJECT ACCOUNT 1, I

15  found SUBJECT ACCOUNT 3 and SUBJECT ACCOUNT 4 listed as accounts linked to

16  SUBJECT ACCOUNT 1.  On February 27, 2018, I contacted Facebook Support and

17  asked how the accounts were linked to each other based on the data they provided.

18  Facebook Support staff informed me that SUBJECT ACCOUNT 1, SUBJECT

19  ACCOUNT 3, and SUBJECT ACCOUNT 4 were all accessed by the same electronic

20  device (one that is capable of accessing the World Wide Web) and under the same

21  "cookie."  A "cookie" is a personal identifier for a specific browser that links to particular

22  web portal.  This means CASTRO is using the same electronic device to access

23  SUBJECT ACCOUNT 1, SUBJECT ACCOUNT 3, and SUBJECT ACCOUNT 4.  The

24  electronic device CASTRO uses remembers his web signature or "cookie" by storing his

25  unique web browsing on Facebook.  Anytime CASRTO reuses the same electronic

26  deveice to browse the web, e.g., Facebook, the device remembers his web identifiers for

27  him.

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

69.     As mentioned before, agents know CASTRO to use SUBJECT ACCOUNT 4 for the purposes of facilitating suspected drug trafficking based on past conversations with the CS.  On multiple occasions, the CS has communicated with SUBJECT ACCOUNT 4 in order to place suspected drug orders through CASTRO.

70.     CASTRO has used SUBJECT ACCOUNT 1, SUBJECT ACCOUNT 2, SUBJECT ACCOUNT 4, SUBJECT ACCOUNT 5, and SUBJECT ACCOUNT 6 for the purposes of organizing suspected drug transactions.  I believe he utilizes multiple accounts for his suspected drug enterprise, to include SUBJECT ACCOUNT 3, in order to avoid detection by law enforcement.  I believe this to be true because it is common for drug traffickers to avoid using the same electronic device and/or personal electronic profile for extended periods, in hopes of avoiding law enforcement.

71.     While comparing the friends lists of SUBJECT ACCOUNTS 1 through 6, I found that SUBJECT ACCOUNT 1, SUBJECT ACCOUNT 4, and SUBJECT ACCOUNT 5 all had common friends.  The "friends list" portion of Facebook is a list of other Facebook accounts known to a specific account.  This allows users to set up communications easier.  Among some of the friends in common between the SUBJECT ACCOUNTS 1, 4 and 5, at least seven friends have been in communication with CASTRO via SUBJECT ACCOUNT 1 for the purposes of organizing suspected drug transactions.  Since CASTRO has a core group of contacts logged, he is easily able to reach out to any of his suspected drug customers from any of his Facebook account(s), which I believe includes SUBJECT ACCOUNT 3.

*Undercover Controlled Purchase #4 Utilizing SUBJECT ACCOUNT 1*

72.     On January 14, 2018, at 3:41 p.m., the UC sent a message to CASTRO via SUBJECT ACCOUNT 1 on Facebook Messenger after unsuccessful attempts to speak with FRIAS (aka "Luis") on the phone.  CASTRO had previously instructed the UC to talk to FRIAS if he needed anything, providing number 206-698-1965 (Target Telephone 4 or TT4) as FRIAS' contact information.  Between 3:41 p.m. to 3:48 p.m., the UC and

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   CASTRO had the following Facebook Messenger conversation via SUJBECT

2   ACCOUNT 1:

3       •   UC: "Hey amigo, are you around?"

4       •   CASTRO: "Kent"

5       •   UC: "I will be back in town later this week. I tried to call "Luis"

6           about business, he didn't know me. Was it the right number?"

7       •   CASTRO: "yes"

8       •   CASTRO: "2066981965"

9       •   UC: "Well he told me I had the wrong number. Did you tell him I

10          might call?"

11      •   CASTRO: "yes, but if you need something will send text to me"

12      •   UC: "Ok, that works"

13    73.    On January 23, 2018, at 1:45 p.m., the UC initiated a Facebook Messenger

14  conversation with CASTRO on SUBJECT ACCOUNT 1.  The following transcript

15  reflects the discussion between 1:45 p.m. to 2:11 p.m.:

16      •   UC: "Hey amigo, is everything good?"

17      •   CASTRO: "yes, how are you?"

18      •   UC: "I was worried after last phone call. Can you do some business

19          today?"

20      •   CASTRO: "yes"

21      •   UC: "Can I get 2 of the brown powder, like last time?"

22      •   CASTRO: "yes"

23      •   UC: "I am in Tacoma, where would you like me to go?"

24      •   CASTRO: "one second please"

25      •   UC: "ok"

26      •   CASTRO: "how much money you pais las time?"

27      •   UC: "2150"

28

1      • CASTRO: "ok"

2      • CASTRO: "how long you will be at Auburn super mall?"

3      • UC: "20 minutes"

4      • CASTRO: "ok, go there please"

5      • CASTRO: "you will meet with my friend...my cousin is at California

6        now."

7      • UC: "Ok, is your friend driving the same car?"

8      • CASTRO: "yes, red Jetta...my cousin will return next week"

9      • UC: "Sounds good amigo. Glad your cousin is safe."

10   74.    Between 2:16 p.m. to 2:41 p.m., the UC and CASTRO had the following

11   conversation via Facebook messenger on SUBJECT ACCOUNT 1:

12     • UC: "Amigo, my customers are asking about fentinil pills,

13       something like oxy. Have you heard of this? Can you get them?"

14     • CASTRO: "I know someone who has that, but he lives in Marysville

15       far away...maybe next time."

16     • CASTRO: "Did you know anything about shawn SHAPUTIS?"

17     • CASTRO: "him not answer me 1 month ago"

18     • UC: "I know Shawn. I haven't talked to him, but heard he is in

19       treatment doing well. Before he left for treatment, I think he was

20       living in his car."

21     • CASTRO: "ok...You have a phone number??"

22     • UC: "360-362-8770"

23

24   75.    From 2:43 p.m. to 3:22 p.m., the UC and CASTRO had the following

25   conversation via Facebook messenger on SUBJECT ACCOUNT 1:

26     • CASTRO: "you're at super mall now?"

27     • CASTRO: "my friend will be at 8 minutes"

28     • UC: "I'm close, traffic is bad. Probably 10 minutes."

AFFIDAVIT OF SPECIAL AGENT LANDIS          – 28 –

1      •    UC: "Is it your friend Luis meeting me?"

2      •    CASTRO: "yes, Luis"

3      •    UC: "ok"

4      •    CASTRO: "what car are you driving?"

5      •    UC: "Same car, F-150"

6      •    UC: "Needs a paint job, got hit in accident."

7      •    CASTRO: "is red color the f-150"

8      •    UC: "No, blue"

9      •    CASTRO: "ok, he is there...how long?"

10     •    CASTRO: "??"

11    76.    At 3:01 p.m., CASTRO made Facebook messenger phone call, which the

12 UC did not answer. CASTRO then sent the following text message over Facebook

13 Messenger text via SUBJECT ACCOUNT 1 to the UC: "??"

14    77.    At 3:02 p.m., the UC made a Facebook messenger phone call, which

15 CASTRO did not answer.  Instead, CASTRO replied on Facebook Messenger text via

16 SUBJECT ACCOUNT 1:

17      •    CASTRO: "you're there?"

18      •    CASTRO: "hey"

19      •    CASTRO: "where you are?"

20      •    UC: "Hey, I am here. Where is he?"

21      •    CASTRO: "is parked front Burlington coat factory"

22      •    CASTRO: "hey"

23      •    CASTRO: "he is waiting for you"

24      •    UC: "Ok, I am driving there now."

25      •    CASTRO: "how long?"

26      •    UC: "5 minutes, where is he by Burlington?"

27      •    CASTRO: "yes"

28

- UC: "I tried calling he didn't answer"
- CASTRO: "him have a new phone number"
- CASTRO: "go to front Burlington"
- UC: "Ok, I am at Burlington, he is in front?"
- CASTRO: "Yes"
- CASTRO: "parked"
- CASTRO: "him see to you. go back please"
- UC: "I parked, does he see me?"
- CASTRO: "is on your right side"
- UC: "Behind me?"
- CASTRO: "right side"

78.     At approximately 3:25 p.m., the UC saw TV1 near the entrance to the Burlington Coat Factory store. After parking next to TV1, the UC got inside TV1, which was occupied by a Hispanic male who introduced himself as "Luis." The two spoke about non-drug related topics before FRIAS ("Luis") received a phone call.

79.     At approximately 3:30 p.m., the UC saw FRIAS answer his phone. The call was believed to be confirmation between CASTRO and FRIAS that the suspected drug transaction was underway. After terminating the call, FRIAS told the UC that it was his "cousin," who agents believe to be CASTRO. The UC acknowledged, and signaled to FRIAS to make the suspected drug exchange. The UC gave FRIAS $2150 in buy money and in return, FRIAS gave the UC suspected heroin wrapped in plastic. Afterwards, the two agreed to meet again in the future and then parted ways.

80.     At 5:17 p.m., the UC reinitiated the Facebook Messenger conversation with SUBJECT ACCOUNT 1. The following transcript reflects the discussion from 5:17 p.m. to 5:20 p.m.

- UC: "No 'thumbs up' amigo? Lol, I look for it after doing business with ya. Seriously, everything went great with Luis, good deal"

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1       •     CASTRO: [Thumbs up graphic]

2       •     UC: "haha, thanks"

3 ***CASTRO Uses SUBJECT ACCOUNT 6 to Contact the CS***

4       81.     In February 2018, CASTRO contacted the CS utilizing the Facebook

5 profile "ALISSA KEYSER" (SUBJECT ACCOUNT 6). During the conversation,

6 CASTRO greeted the CS, as he normally would when organizing a suspected drug

7 transaction with the CS. The CS replied to CASTRO by saying that he/she was no longer

8 interested in buying drugs. CASTRO subsequently acknowledged and ended the brief

9 conversation. Based on how the CS has organized suspected drug transactions with

10 CASTRO in the past, how CASTRO abruptly ended the conversation after the CS stated

11 that he/she wasn't interested in drugs and how CASTRO utilizes multiple Facebook

12 accounts for the purposes of organizing drug transactions, I believe CASTRO contacted

13 the CS using SUBJECT ACCOUNT 6 for the sole purpose of organizing a drug

14 transaction. Additionally, during a search of the information displayed on the public

15 profile page of SUBJECT ACCOUNT 6, I looked at the friend list and compared it to the

16 other SUBJECT ACCOUNTS' friend lists. I found that the accounts all had multiple

17 friends in common, and among the common friends were accounts that had been in

18 contact with SUBJECT ACCOUNT 1 for the purposes of organizing suspected drug

19 transactions. I believe SUBJECT ACCOUNT 6 is being utilized by CASTRO to further

20 his suspected DTO by using the account as a means to organize suspected drug

21 transactions.

22       **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

23       82.     I anticipate executing this warrant under the Electronic Communications

24 Privacy Act, in particular Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A)

25 and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the

26 government copies of the records and other information (including the content of

27 communications) particularly described in Section I of Attachment B. Upon receipt of

28

AFFIDAVIT OF SPECIAL AGENT LANDIS      – 31 –     

1 the information described in Section I of Attachment B, government-authorized persons

2 will review that information to locate the items described in Section II of Attachment B.

3    83.    As indicated in the Motion for Nondisclosure and Motion to Seal that

4 accompany this Affidavit, the government requests, pursuant to the preclusion of notice

5 provisions of Title 18, United States Code, Section 2705(b), that Facebook be ordered not

6 to notify any person (including the subscriber or customer to which the materials relate)

7 of the existence of this warrant for such period as the Court deems appropriate. The

8 government submits that such an order is justified because notification of the existence of

9 this Order would seriously jeopardize the ongoing investigation. Such a disclosure would

10 give the subscriber an opportunity to destroy evidence, change patterns of behavior,

11 notify confederates, or flee from prosecution. Notifying our targets of the existence of

12 this investigation will likely cause them to destroy evidence, flee the jurisdiction, or alter

13 their methods, thus making it more difficult to dismantle the organization effectively.

14 Notice also could put the CS, UC, and agents working with them in danger

15    84.    It is further respectfully requested that this Court issue an order sealing all

16 papers submitted in support of this application, including the application and search

17 warrant, until such dates as provided in the proposed Order. I believe that sealing this

18 document is necessary because the items and information to be seized are relevant to an

19 ongoing investigation. Premature disclosure of the contents of this Affidavit and related

20 documents may have a significant and negative impact on the continuing investigation

21 and may severely jeopardize its effectiveness.

22    **COMMON CHARACTERISTICS OF DRUG TRAFFICKERS**

23    85.    Based on my training and experience, including experience obtained

24 through participation in this and other investigations involving the distribution of

25 controlled substances, including those targeting long-term conspiracies responsible for

26 the distribution of controlled substances, and based upon my consultation with other

27 experienced law enforcement agents and officers, I know that:

28

1    a.    Drug trafficking conspiracies, especially those involving large amounts of

2  narcotics and interstate shipments, usually take place over several months or years, and

3  continue to operate even when enforcement activity results in arrests and/or seizures of

4  drugs and/or money.

5    b.    Those involved in the distribution of illicit drugs often communicate by

6  telephone in connection with their illegal activities in order to set up meetings with

7  coconspirators, conduct drug transactions, or to arrange for the transportation drugs or

8  drug proceeds.

9                              **CONCLUSION**

10    86.    Based upon the information which has been uncovered during the course of

11  this investigation, and on the advice, experience, knowledge of other agents and officers

12  involved in this investigation, I believe these facts establish probable cause to conclude

13  that SUBJECT ACCOUNT 1, SUBJECT ACCOUNT 2, SUBJECT ACCOUNT 3,

14  SUBJECT ACCOUNT 4, SUBJECT ACCOUNT 5, and SUBJECT ACCOUNT 6 have

15  been used, and will continue to be used, to facilitate violations of the Controlled

16  Substances Act, specifically distribution of narcotics, conspiracy, and related offenses in

17  the Western District of Washington, and elsewhere, in violation of the Controlled

18  Substances Act, Title 21, United States Code, Sections 841 and 846.

19

20                              _____
                               SAMUEL T. LANDIS,
21                               Special Agent
                               Drug Enforcement Administration
22

23

24  Subscribed and sworn to before me this ___8th___ day of March, 2018.

25

26                              _____
27                               THERESA L. FRICKE
                               UNITED STATES MAGISTRATE JUDGE
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **ATTACHMENT A1**

### **Property to Be Searched**

This warrant applies to information associated with the following account, identified by Facebook user ID: /katherine.thomas.104418 ("SUBJECT ACCOUNT 1"), for all such information that is stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Menlo Park, California.  This warrant is limited to information created after January 1, 2018.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## __ATTACHMENT A2__

### **Property to Be Searched**

This warrant applies to information associated with the following account, identified by Facebook user ID: /juanandres.castrovalenzuela ("SUBJECT ACCOUNT 2"), for all such information that is stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Menlo Park, California.  This warrant is limited to information created after June 1, 2016.

AFFIDAVIT OF SPECIAL AGENT LANDIS

– 35 –

# ATTACHMENT A3

## Property to Be Searched

This warrant applies to information associated with the following account, identified by Facebook user ID: /diego.jaureguicastro ("SUBJECT ACCOUNT 3"), for all such information that is stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Menlo Park, California.  This warrant is limited to information created after June 1, 2016.

AFFIDAVIT OF SPECIAL AGENT LANDIS

– 36 –

## **ATTACHMENT A4**

### **Property to Be Searched**

This warrant applies to information associated with the following account, identified by Facebook user ID: /annel.baker.5 ("SUBJECT ACCOUNT 4"), for all such information that is stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Menlo Park, California.  This warrant is limited to information created after June 1, 2016.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## ATTACHMENT A5

### Property to Be Searched

This warrant applies to information associated with the following account, identified by Facebook user ID: /rebeca.spencer.1 ("SUBJECT ACCOUNT 5"), for all such information that is stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Menlo Park, California.  This warrant is limited to information created after June 1, 2016.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **ATTACHMENT A6**

### **Property to Be Searched**

This warrant applies to information associated with the following account, identified by Facebook user ID: /alissa.keyser ("SUBJECT ACCOUNT 6"), for all such information that is stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Menlo Park, California.  This warrant is limited to information created after June 1, 2016.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1
2

# ATTACHMENT B

## Particular Things to be Seized

3    **I.    Information to be disclosed by Facebook**

4         To the extent that the information described in Attachment A is within the

5    possession, custody, or control of Facebook, including any messages, records, files, logs,

6    or information that have been deleted but are still available to Facebook, or have been

7    preserved pursuant to a request made under Title 18, United States Code, Section 2703(f),

8    Facebook is required to disclose the following information to the government for the user

9    IDs listed in Attachments A1 through A6 ( "SUBJECT ACCOUNT 1, SUBJECT

10   ACCOUNT 2, SUBJECT ACCOUNT 3, SUBJECT ACCOUNT 4, SUBJECT

11   ACCOUNT 5, and SUBJECT ACCOUNT 6"):

12        A. The following information about the customer or subscriber of SUBJECT

13             ACCOUNT 1, SUBJECT ACCOUNT 2, SUBJECT ACCOUNT 3, SUBJECT

14             ACCOUNT 4, SUBJECT ACCOUNT 5, and SUBJECT ACCOUNT 6:

15        (a)    All contact and personal identifying information, including full name, user

16               identification number, birth date, gender, contact e-mail addresses,

17               Facebook passwords, Facebook security questions and answers, physical

18               address (including city, state, and zip code), telephone numbers, screen

19               names, websites, and other personal identifiers.

20        (b)    All activity logs for SUBJECT ACCOUNT 1, SUBJECT ACCOUNT 2,

21               SUBJECT ACCOUNT 3, SUBJECT ACCOUNT 4, SUBJECT ACCOUNT

22               5, and SUBJECT ACCOUNT 6, and all other documents showing the

23               user's posts and other Facebook activities;

24        (c)    All photos and videos in their original format, including EXIF information

25               (metadata), uploaded by that user ID and all photos and videos in their

26               original format, including EXIF information (metadata), uploaded by any

27               user that have that user tagged in them;

28

1    (d)    All other records of communications and messages made or received by the
2            user, including all private messages, chat history, calling history, and
3            pending "Friend" requests;
4    (e)    All "check ins" and other location information;
5    (f)    All IP logs, including all records of the IP addresses that logged into
6            SUBJECT ACCOUNT 1, SUBJECT ACCOUNT 2, SUBJECT ACCOUNT
7            3, SUBJECT ACCOUNT 4, SUBJECT ACCOUNT 5, and SUBJECT
8            ACCOUNT 6;
9    (g)    All past and present lists of friends created by SUBJECT ACCOUNT 1,
10           SUBJECT ACCOUNT 2, SUBJECT ACCOUNT 3, SUBJECT ACCOUNT
11           4, SUBJECT ACCOUNT 5, and SUBJECT ACCOUNT 6;
12    (h)    All records of Facebook searches performed by SUBJECT ACCOUNT 1,
13           SUBJECT ACCOUNT 2, SUBJECT ACCOUNT 3, SUBJECT ACCOUNT
14           4, SUBJECT ACCOUNT 5, and SUBJECT ACCOUNT 6;
15    (i)    The length of service (including start date);
16    (j)    The means and source of payment for such service (including any credit
17           card or bank account number) and billing records;
18    (k)    All records pertaining to communications between Facebook and any
19           person regarding the user or the user's Facebook account, including
20           contacts with support services and records of actions taken;
21    (l)    Names (including subscriber names, Facebook user IDs, and screen
22           names);
23    (m)    Addresses (including mailing addresses, residential addresses, business
24           addresses, and e-mail addresses);
25    (n)    Local and long distance telephone connection records;
26    (o)    Linked accounts; and
27    (p)    Telephone or instrument numbers or identities (including MAC addresses).
28

B. All records and other information (not including the contents of communications) relating to SUBJECT ACCOUNT 1, SUBJECT ACCOUNT 2, SUBJECT ACCOUNT 3, SUBJECT ACCOUNT 4, SUBJECT ACCOUNT 5, and SUBJECT ACCOUNT 6, including:

   (a)   Records of user activity for each connection activity for each connection made to or from SUBJECT ACCOUNT 1, SUBJECT ACCOUNT 2, SUBJECT ACCOUNT 3, SUBJECT ACCOUNT 4, SUBJECT ACCOUNT 5, and SUBJECT ACCOUNT 6, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination of Internet Protocol addresses;

   (b)   Information about each communication sent or received by SUBJECT ACCOUNT 1, SUBJECT ACCOUNT 2, SUBJECT ACCOUNT 3, SUBJECT ACCOUNT 4, SUBJECT ACCOUNT 5, and SUBJECT ACCOUNT 6, including the date and time of the communication, the method of the communication (such as source and destination email addresses, IP addresses, and telephone numbers); and

   (c)   Records of any Facebook accounts that are linked to SUBJECT ACCOUNT 1, SUBJECT ACCOUNT 2, SUBJECT ACCOUNT 3, SUBJECT ACCOUNT 4, SUBJECT ACCOUNT 5, and SUBJECT ACCOUNT 6 by machine cookies (meaning all Facebook user IDs that logged into Facebook by the same machine or device as SUBJECT ACCOUNT 1, SUBJECT ACCOUNT 2, SUBJECT ACCOUNT 3, SUBJECT ACCOUNT 4, SUBJECT ACCOUNT 5, and SUBJECT ACCOUNT 6).

**II.**   **Information to be seized by the government**

All information described above in Section I that relates to the ongoing narcotics investigation described in the Affidavit, including, for the user ID identified on Attachments A1 through A6, information pertaining to the following matters:

(a) Any content including e-mails, messages, texts, photographs (including metadata), videos (including metadata), visual images, documents, spreadsheets, address lists, contact lists or communications of any type which could be used to identify the user and or their location.

(b) Records relating to who created, used, or communicated with the user ID, including records about their identities and whereabouts.

(c) All subscriber records associated with SUBJECT ACCOUNT 1, SUBJECT ACCOUNT 2, SUBJECT ACCOUNT 3, SUBJECT ACCOUNT 4, SUBJECT ACCOUNT 5, and SUBJECT ACCOUNT 6, including names, addresses, local and long distance telephone connection records, or records of session times and durations, length of service (including start date) and types of service utilized, telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address, and means and source of payment for such service including any credit card or bank account number.

(d) Any and all other log records, including IP address captures, associated with SUBJECT ACCOUNT 1, SUBJECT ACCOUNT 2, SUBJECT ACCOUNT 3, SUBJECT ACCOUNT 4, SUBJECT ACCOUNT 5, and SUBJECT ACCOUNT 6; and

(e) Any records of communications between Facebook and any person about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users about SUBJECT ACCOUNT 1, SUBJECT ACCOUNT 2, SUBJECT ACCOUNT 3, SUBJECT ACCOUNT 4, SUBJECT ACCOUNT 5, and/or SUBJECT ACCOUNT 6. This is to include records of contacts between the subscriber and the provider's support services, as well as records of any actions taken by the provider or subscriber as a result of the communications.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800